**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

**MICHAEL ANTHONY COLAR, JR.**            **CIVIL ACTION**
*PLAINTIFF*

                                             **NO.: 24-38-BAJ-RLB**

**VERSUS**

**ATLANTIC SPECIALTY INSURANCE**
**COMPANY, ET AL.**
*DEFENDANTS*                                     **JURY TRIAL**

---

**MEMORANDUM OF PLAINTIFF IN OPPOSITION TO THE**
**MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANTS,**
**COAL CITY COB COMPANY, INC., AND XL INSURANCE AMERICA, INC.**

---

       **NOW COMES**, Plaintiff, Michael Anthony Colar, Jr. ("Colar" or Plaintiff), through undersigned counsel, who submits this Opposition to the Motion for Summary Judgment (R. Doc. 36) filed by Defendants, Coal City COB Company, Inc. ("Coal City") and its insurer, XL Insurance Company, Inc. ("XL"). At the time of the subject collision, which forms the subject matter of this litigation, Defendant, James Powell, Jr. ("Powell"), was under dispatch with Coal City and was on a trip with a business purpose in furtherance of the contract to haul cargo for Coal City; therefore, the public liability insurance policy issued by XL, including the MCS-90 Endorsement, to Coal City provided coverage for the damages caused to Colar arising from the subject collision involving Powell. As discussed in more detail below, Defendants' Motion for Summary Judgment should be DENIED.

## I. FACTUAL BACKGROUND

       This suit arises from a motor vehicle collision that occurred on 06/17/2022 between a 2015 Peterbilt tractor (the "Tractor") driven by Powell and a 2017 Ford Mustang driven by Colar. *See*

Plaintiff's Second Amended Complaint for Damages and Jury Demand (R. Doc. 31) at ¶¶ 11-16. The Tractor operated by Powell was owned by Sequoia Powell Global Transport Company, LLC ("Sequoia"). *See* Exhibit 2 to Coal City/XL MSJ – Deposition transcript of Powell at Page 9:3-24. Powell is the owner and sole employee of Sequoia.

Sequoia entered into a contract with Coal City on 09/23/2019, wherein it agreed to provide the Tractor and an operator (Powell) for transportation services for the benefit of Coal City. *See* Exhibit 1 to Coal City/XL MSJ - Independent Contractor Agreement ("Agreement")(R. Doc. 36-5). After Sequoia entered into the Agreement with Coal City in 2019, Sequoia hauled exclusively for Coal City. *See* Exhibit 2 to Coal City/XL MSJ – Deposition transcript of Powell, Pages 10:17 – 13:22. At the time of the subject collision, Sequoia was a party to a contract with Coal City to haul cargo. *See Id.*

Pursuant to the Agreement with Coal City, Powell was required to maintain the Tractor in a safe condition in accordance with all applicable motor carrier laws; *see* ¶6(a), which provides:

> INDEPENDENT CONTRACTOR shall, at its sole cost and expense, provide all the Equipment ready to operate and fully roadworthy, … and shall furnish all necessary … parts, supplies and equipment necessary or required for the safe and efficient operation and maintenance of the Equipment, including repairs for the operation of such Equipment.

*See* Exhibit 1 to Coal City/XL MSJ – Agreement (R. Doc. 36-5), ¶6(a), Page 6 of 15. Also, *see* ¶6(e) of the Agreement, which provides:

> INDEPENDENT CONTRACTOR shall be responsible for all costs and expenses required in maintaining, and shall maintain the Equipment in safe condition and in complete compliance with all Motor Carrier Laws and any and all laws c1nd (sic) regulations of the states in which INDEPENDENT CONTRACTOR operates"].

*See Id.,* ¶6(e), Page 6 of 15. Appendix E(1) to the Agreement entitled "Insurance Requirements" provides:

> **INDEPENDENT CONTRACTOR shall be covered under CARRIER's public liability**, property damage and, with regard to **common carrier service**, cargo loss or

damage **insurance coverage while INDEPENDENT CONTRACTOR is operating the Equipment on behalf of CARRIER (i.e., while under dispatch by CARRIER)**. …. [Emphasis added.]

*See* Exhibit 1 to Coal City/XL MSJ – Agreement (R. Doc. 36-5), Page 15 of 15.

In his deposition, Mr. Powell discussed his activities and his hauling assignments for Coal City on the day before, the day of, and the day after the subject collision, which included a trip from the Coal City yard in Gonzales to O'Reilly's Auto Parts to purchase parts and equipment for the maintenance of this Tractor as required under the Agreement, as follows:

1. On 06/14/2022, Powell picked up an empty trailer from the Coal City yard in Garland, TX, picked up a load of latex and delivered the load for Coal City in Decatur, GA. *See* Exhibit 2 to Coal City/XL MSJ – Deposition transcript of Powell at Pages 55:23-57:6; *see* Plaintiff's Exhibit 1, Bill of Lading dated 6/14-16/2022.

2. After delivering the load of latex for Coal City in Decatur, GA, Powell drove the now-empty trailer ("deadhead") from Decatur to Gonzales, LA. *See* Exhibit 2 to Coal City/XL MSJ – Deposition transcript of Powell at Page 56:3-6).

3. While Powell was driving from Decatur, GA to Gonzales, LA, dispatch of Coal City notified Powell that he was to pick up a load of latex in Carville, LA, on 6/18/2022 (the next day) to haul for Coal City to Garland, TX. *See* Exhibit 3 to Coal City/XL MSJ - Supplemental Deposition of James Powell (R. Doc. 36-7) at Page 22:3-15, which provides:

   Q.  I know you said that you had -- you deadheaded from Decatur back to Louisiana.· And at the point that you were deadheading back to Louisiana, you knew what your next load was going to be. Do you remember how you got that information?

   A.  **Dispatch**. [Emphasis added.]

   Q.  Was that texted to you, emailed to you? How was that given to you from dispatch?

   A.  Probably text, email, call. Dispatch routes you. They pretty much know your whole route on your way back -- all the way back to the yard.  So they – they preplan you before you go out. And anything changes while you out, they'll tell you where to go.

4. Powell arrived in in Gonzales, LA on 06/17/2022 and dropped off the empty trailer at the Coal City yard in Gonzales to be cleaned so he could pick up a second load of

latex from Carville, LA to be delivered in Ennis, TX; when Powell arrived to the Coal City yard in Gonzales, he already had the next assignment to haul cargo for Coal City the next day—06/18/2022. *See* Exhibit 2 to Coal City/XL MSJ – Deposition transcript of Powell at Pages 32:6-34:15 and Page 51:1-21.

5. While the trailer was being cleaned, Powell drove the Tractor (without the trailer) from the Coal City yard directly to O'Reilly's Auto Parts to pick up washer fluid, windshield wiper blades, and other parts to perform maintenance on the Tractor. *See Id.*, Pages 59:19-60:10.

6. As Powell was leaving the parking lot of O'Reilly's on 06/17/2022, the subject collision occurred involving Colar. *See Id.*, at Page 61:3-5.

7. After Powell left the crash scene, he drove straight to the Coal City yard in Gonzales to perform maintenance on his Tractor. *See Id.*, Page 61:6-13).

8. Powell testified the maintenance he performed on the Tractor in the Coal City yard in Gonzales with the O'Reilly's parts purchases was in furtherance of the maintenance obligations under the Agreement between Sequoia and Coal City. *See Id.*, Page 33:6-15 and Pages 37:23-38:23.

9. Powell spent the night of 6/17/2022 in the Tractor in the Coal City yard because he had a scheduled hauling assignment from Coal City to haul latex the next morning on 06/18/2022. *See Id.*, Pages 33:6 – 35:24.

10. The next morning on 06/18/2022, Powell picked up the cleaned trailer (the same one he hauled from Decatur, GA to Gonzales, LA) in the Coal City yard and he drove the Tractor/trailer to Carville, LA to pick up another load of latex, which he hauled back to Ennis, TX for Coal City on 06/18/2022. *See Id.*, Pages 51:1-21; *See* Plaintiff's Exhibit 2, Bill of Lading dated 6/18/2022.

Powell testified that all the activities discussed above, including the trip to O'Reilly's Auto Parts in Gonzales, LA, where the subject collision occurred, were in furtherance of the Agreement between Sequoia and Coal City. Powell was under dispatch [*See* Exhibit 3 to Coal City/XL MSJ - Supplemental Deposition of James Powell (R. Doc. 36-7) at Page 22:3-15] and in the middle of a transportation job for Coal City at the time the subject collision occurred [*See* Exhibit 2 to Coal City/XL MSJ – Deposition transcript of Powell at Pages 66:12–67:2]. Powell also testified that his trip for O'Reilly's Auto Parts was not for personal reasons, stating: "Long as I'm in this truck and they number -- they -- they symbols is on side of that truck and I'm using their authority, yes,

the contract was always [in effect]." *See Id.*, Pages 66:12-67:14. Further, Powell was under dispatch with Coal City during his entire trip starting on 06/12/2022 in Garland TX until he returned to Garland TX on 06/18/2022, including 06/17/2022—the day of the subject collision in Gonzales. *See* Exhibit 3 to Coal City/XL MSJ - Supplemental Deposition of James Powell (R. Doc. 36-7) at Page 22:3-15.

In his deposition, Powell explained that he went to O'Reilly's Auto Parts because he was "getting things to work on my truck," and described the trip as part of preparing the Tractor for future hauling assignments with Coal City. *See* Exhibit 2 to Coal City/XL MSJ – Deposition transcript of Powell at Pages 33:6-24 and 59:19 –63:24. As Powell explained in his deposition:

> Q:     Yes, sir. The trip to O'Reilly's to pick up the items that you identified, windshield wipers and some other parts for maintenance, was the purpose of the trip personal or was it for business?
>
> A:     It's all for business.
>
> Q:     And is that the business between Coal City and Sequoia?
>
> A:     That's business for everybody.
>
> Q:     But would it also include for Sequoia and Coal City?
>
> A:     If I'm buying – if I'm buying truck material for a truck, it's for business. It's business for everybody. My truck need to be compliance for anything that--that's underneath those rules you just showed me earlier, and so I was--I was isolating that, getting stuff to stay incompliance with the rules.
>
> Q.     With the contract we talked about –
>
> A.     Yes.
>
> Q.     -- before?
>
> A.     Yes, sir. I'm sorry if I -- if I misspoke, yes.
>
> Q.     And that's -- that's the contract between Sequoia and Coal City?
>
> A.     Yes.

*See Id.,* at Pages 37:23 – 38:23.  Powell testified that he was getting windshield wiper blades and some parts at O'Reilly's Auto Parts to do "regular maintenance" on his Tractor, as follows:

> Q:  Did you need those parts and the windshield wipers, the stuff that you bought at O'Reilly's in order for your – so that your truck would function safely and properly?
>
> A:  Well, I was doing just regular maintenance and getting things I needed with the little downtime that I had before I – whenever I picked up to leave, and plus the parts are cheap there instead of a truck stop so –
>
> Q:  So this downtime, how much downtime were you going to have after you dropped the trailer off at the yard until the next – the next job?
>
> A:  I was just waiting. I was waiting until the next morning or evening for my next assignment. Well, I already had my assignment. But I got up the next morning, probably the pickup was at like 9:00 or 10:00, something like that.
>
> Q:  So this – the collision took place at a time where you already had another assignment with Coal City; is that correct?
>
> A:  Yes.

*See Id.,* at Pages 33:16 – 34:13.

The subject collision occurred while Powell was in Gonzales because he was under dispatch waiting to haul another load pursuant to his next assignment from Coal City. *See Id.,* at Pages 33:16 – 34:9.  The purpose of Powell's trip to O'Reilly's Auto Parts was for business. *See Id.,* at Pages 37:23 – 38:23.  Powell's trip from the Coal City yard in Gonzales to an O'Reilly Auto Parts in order to purchase parts and equipment for his Tractor – immediately after dropping off a trailer for Coal City and while under dispatch for his next scheduled delivery – was not a "purely personal" endeavor as Coal City and XL assert in their Memorandum.

Coal City and XL claim at Page 2 in their Memorandum that Powell, when driving the Tractor to and from O'Reilly's Auto Parts, "ceased to be doing the work of Coal City." This statement is contrary to the testimony of Powell, who testified, as follows:

6

> Q.    **So while you were in Gonzales, were you still under the direction of Coal City regarding the next pick up in Carville**?
>
> A.    To answer that question from everything I'm hearing from both parties, but **I would say I was**, but I don't -- once I dropped the tank off to be washed out, you -- you can go get something to eat or you can go do the things you need to do and then this and that. But so but I already knew my next load assignment. So how would you answer that? **I already knew my next load assignment. I dropped the tank and then I picked it up**. How would you -- how would you declare that? How would you declare that? [Emphasis added.]

*See* *Id.,* at Pages 52:2-15.

Powell consistently stated that the trip to O'Reilly's Auto Parts was to pick up parts and equipment needed for maintenance on the Tractor; this trip was in furtherance of the ¶6(a) of the Agreement, which requires Sequoia to "furnish all necessary oil, fuel, tires and other **parts, supplies and equipment necessary or required for the safe and efficient operation and maintenance of the Equipment** [tractor], …" *See* Exhibit 1 to Coal City/XL MSJ - Independent Contractor Agreement ("Agreement")(R. Doc. 36-5), ¶6(a),  Page 6 of 15.  It is critical to the safe operation of the Tractor for Powell to have the clear visibility provided by new windshield wipers and wiper fluid. Powell specifically testified that he replaced the windshield wipers, windshield fluid, and other maintenance in order to safely drive the Tractor on the next hauling assignment for Coal City. *See* Exhibit 2 to Coal City/XL MSJ – Deposition transcript of Powell (R. Doc. 36-6), Page 62:16-20.   Herein, Powell has identified specific facts to show that Powell's trip to O'Reilly's Auto Parts was connected to maintenance of the Tractor in furtherance of the terms of the Agreement and was under dispatch with Coal City for his next cargo hauling assignment— activities in direct furtherance of the business of Coal City, a motor carrier, under the express terms of the Agreement with Coal City.  Powell's trip to O'Reilly's was not purely a personal mission as Coal City and XL argue; therefore, the Motion for Summary Judgment filed by Coal City and XL should be DENIED.

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The court may grant summary judgment when the record establishes that there is no dispute as to the material facts and, as a matter of law, the movant is entitled to judgment. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.*

Once the party seeking summary judgment carries its burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  "Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible .... the material may be presented in a form that would not, in itself, be admissible at trial." Lee v. Offshore Logistical & Transp., LLC, 859 F.3d 353, 355 (5th Cir. 2017) (quotation omitted).  The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." Anderson, at 255, 106 S.Ct. 2505.

The interpretation of an insurance policy is a question of law, and cases involving the interpretation of an insurance policy are appropriate for disposition on summary judgment.

Principal Health Care v. Lewer Agency, 38 F.3d 240, 242 (5th Cir.1996). An insurance policy is a conventional obligation that constitutes the law between the insured and insurer, and the agreement governs the nature of their relationship. Peterson v. Schimek, 98–1712 (La. 3/2/99); 729 So.2d 1024, 1028.  In interpreting an insurance contract, Louisiana law provides its provisions be construed using the general rules of contract interpretations set forth in the Louisiana Civil Code. First Am. Bank v. First Am. Transp. Title Ins. Co., 585 F.3d 833, 837 (5th Cir. 2009). "The role of the judiciary in interpreting an insurance contract is to ascertain the common intent of the insured and insurer as reflected by the words of the policy." Gorman v. City of Opelousas, 148 So. 3d 888, 892 (La. 2014). "When the words of an insurance contract are clear, explicit and lead to no absurd consequences, courts must enforce the contract as written and make no further interpretation in search of the parties' intent." La. Civ. Code. Art. 2046. "An insurance policy should not be interpreted in an unreasonable or strained manner so as to enlarge or to restrict its provision beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion." Lodwick, LLC v. Chevron U.S.A., Inc., 126 So. 3d 544, 549-50 (La. App. 2 Cir. 013).

III.    **ARGUMENT IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT FILED BY COAL CITY AND XL**

A.      *Under the terms of the Policy issued by XL to Coal City, the XL Policy provides insurance coverage for the negligent operation of the Tractor by Powell for the Bodily Injury and Property Damage claims brought here by Colar*

XL issued a commercial general liability policy to Coal City, which includes Form MCS-90 entitled "Endorsement for Motor Carrier Policies of Insurance for Public Liability under Sections 29 and 30 of the Motor Carrier Act of 1980." *See* Exhibit 4 to Coal City/XL MSJ - Policy

(R. Doc. 36-8), at Page 56-58 of 141.  This MCS-90 endorsement amends the general liability

policy issued to Coal City by XL; the MCS-90 endorsement provides:

> **The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended** to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Motor Carrier Safety Administration (FMCSA).
>
> In consideration of the premium stated in the policy to which this endorsement is attached, **the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980** regardless of whether or not each motor vehicle is specifically described in the policy and **whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere**. Such insurance as is afforded, for public liability, does not apply to injury to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo.  **It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described**, irrespective of the financial condition, insolvency or bankruptcy of the insured. [Emphasis added.]

*See* <u>*Id.*</u>

The MCS-90 endorsement is part of the insurance contract between Coal City and XL and

specifically states that "no condition, provision, stipulation, or limitation contained in the policy

… shall relieve the company from liability …"  By the terms of the XL Policy itself, XL was

obligated to provide public liability coverage for property damage and bodily injury claims

"resulting from negligence in the operation, maintenance or use of motor vehicles" used for the

business purposes of the insured, Coal City.  The MCS-90 endorsement amends the XL Policy to

provide public liability coverage resulting from the negligent operation of the Tractor by Powell

used in Coal City's transportation business.  Therefore, the Policy provides coverage for the

property damage and bodily injuries caused to Colar in the subject collision arising from Powell's negligent operation of the Tractor.

At page 6 of its Memorandum, Defendants assert that an "'insured' includes the named insured, Coal City Cob Company, Inc., and anyone else while using a covered 'auto' with the permission of Coal City, except the owner or anyone else from whom Coal City hires or borrows a covered 'auto.' (Id. at (II)(A)(1))." Defendants claim that Powell is not an "Insured" under the XL policy while driving the Tractor because he is the owner of Sequoia, which owns the Tractor that Coal City hired to transport cargo through the Agreement. However, the MCS-90 endorsement expressly amends the XL policy to provide public liability insurance coverage, which would cover the damages suffered by Colar in the subject collision resulting from Powell's negligent operation of the Tractor. When the words of an insurance contract are clear, explicit and lead to no absurd consequences, courts must enforce the contract as written and may make no further interpretation in search of the parties' intent. Peterson v. Schimek, 98–1712 (La. 3/2/99); 729 So.2d 1024, 1028. The MCS-90 endorsement overrules the general exclusionary terms of the XL Policy cited by Defendants.

In his deposition, Powell was asked about his insurance coverage for the Tractor and he stated:

> Q. Now, at the time of the collision, you were still under -- Sequoia was still under contract with Coal City. My question is, did Coal City provide insurance to Sequoia and to you to cover the operation of the 2015 Peterbilt?

> A. I think on that contract it is stating that I need to have provided insurance; if not, I couldn't operate underneath them. So I bought the insurance packages -- package and let them direct deposit it out of my check every week through the Coal City.

> Q. So you bought the insurance package that was -- that you needed to comply with the contracting? You bought that from Coal City or through Coal City, I should say?

A.      I bought it -- yeah, I bought it through Coal City because more insurance the more discounts they have, yes.

Q.      And you -- you paid that, as you said, with a -- with a deduction to what you would earn for haul -- hauling cargo for Coal City?

A.      Yeah. They pulled it -- yeah. They pulled it out of my settlement.

*See* Exhibit 2 to Coal City/XL MSJ - Deposition of James Powell (R. Doc. 36-6), at Pages 45:9-46:7.  It was Powell's understanding that he purchased all the insurance from Coal City he needed to operate the Tractor. Now, when Powell needs the insurance the most, Coal City is denying coverage.

The judicial responsibility in interpreting insurance contracts is to determine the parties' common intent. La. C.C. art. 2045.  As the Louisiana Supreme Court held in <u>Peterson v. Schimek</u>, 729 So.2d at 1028, the extent of coverage afforded by the XL Policy is determined from the intent of the parties as reflected by the words of the insurance policy.  The unambiguous effect of the MCS-90 endorsement is to amend the XL Policy to provide public liability insurance coverage for the negligent operation of motor vehicles that are operated for the benefit of Coal City.   The clear language of the XL Policy and the MCS-90 endorsement extends coverage for the property damage and bodily injury claims of Colar arising from the subject collision caused by the negligence of Powell.

The XL Policy provides coverage to Powell for a second reason.  The XL Policy states that an "insured" includes "you for any covered 'auto,'" and, "anyone else while using with your permission a covered 'auto' you own, hire, or borrow, except… (1) the owner or anyone else from whom you hire or borrow a covered 'auto.'"  *See* Exhibit 4 to Coal City/XL MSJ - Policy (R. Doc. 36-8), at Page 37 or 141.  XL asserts at Pages 6-7 of its Memorandum that Powell is not an "insured" because "the policy excludes coverage for the Sequoia tractor, expressly so when it is

being operated by the owner from whom it was borrowed."  However, Powell is not the owner of the Tractor involved in the subject collision; the owner of the truck is Sequoia and the Agreement with Coal City is with Sequoia, not Powell. *See* Defendants' Statement of Undisputed Material Facts No. 1 (Rec. D. 36-2); *See* Exhibit 2 to Coal City/XL MSJ - Deposition of James Powell (R. Doc. 36-6), at Page 9:3-10. Therefore, the "hire or borrow" exclusion cited by Coal City and XL does not apply here.  Powell qualifies as "anyone else" who was using a covered "auto" that Coal City had hired to perform work. Therefore, Powell is an "insured" who should be afforded coverage by the XL policy.

The XL Policy provides coverage to Powell for the two reasons discussed above; therefore, Coal City and XL should not be dismissed by summary judgment

> **B.**    ***Under The Agreement, Coal City is obligated to provide Public Liability insurance coverage for Bodily Injury and Property Damage claims to Powell.***

¶2(d) of the Agreement between Coal City and Sequoia is entitled "Use of Equipment" and provides: "The parties agree to be bound by all Motor Carrier Laws applicable to operations hereunder." *See* Exhibit 1 to Coal City/XL MSJ - Agreement, at ¶2(d) (R. Doc. 36-5), Page 2 of 15.  ¶1(f) defines "Motor Carrier Laws" as:

> (1) Federal Motor Carrier Act and the rules and regulations of the Federal Motor Carrier Safety Administration, including 49 C.F.R. Parts 382, 383, 391, 392 and 395; (2) Motor Carrier Act of 1980; (3) rules and regulations of DOT; (4) the rules and regulations of the Interstate Commerce Commission; and (5) Interstate Commerce Commission Termination Act of 1995, together with any and all successor or replacement legislation enacted with respect to such laws, statures, rules and regulations.
> …

*See Id.*, at ¶1(f), Page 1 of 15.  Sections 29 and 30 of the Motor Carrier Act of 1980 require the XL Policy issued to Coal City to include the MCS-90 endorsement, which amends the XL Policy to provide public liability coverage resulting from the negligent operation of the motor carrier, like Coal City. The MCS-90 endorsement also is "to assure compliance by the insured [Coal City],

within the limits stated herein, as a motor carrier of property" with the rules and regulations of the Federal Motor Carrier Safety Administration (FMCSA). The Agreement expressly states that the parties will comply with the Motor Carrier Laws. The enforcement of the MCS-90 endorsement to provide coverage to Powell for the damages to Colar arising from the subject collision is consistent with the terms of the Agreement between Sequoia and Coal City. Under ¶3(b), Coal City has assumed complete responsibility for the operation of the Tractor, as required by the Motor Carrier Laws. *See* Id., at ¶3(b), Page 4 of 15.

In addition, ¶8(a) and ¶8(e) of the Agreement with Sequoia entitled "Insurance," require Coal City to discharge the following responsibilities and obligations, as follows:

(a)     Unless authorized to be self-insured, **CARRIER shall maintain public liability**, property damage, and cargo **insurance** in such amounts as are required by the Interstate Commerce Commission, Department of Transportation, and applicable state regulatory agencies and as set forth in Appendix E. [Emphasis added.]

…

(e)     **CARRIER shall maintain insurance coverage for the protection of the public** pursuant to the Interstate Commerce Commission's regulations under 49 U.S.C. Section 10927. [Emphasis added.]

*See Id.*, at ¶8(a) and ¶8(e) (R. Doc. 36-5), Page 8 of 15.   Appendix E(1) to the Agreement entitled "Insurance Requirements" provides:

INDEPENDENT CONTRACTOR shall be covered under CARRIER's public liability, property damage and, with regard to common carrier service, cargo loss or damage insurance coverage while INDEPENDENT CONTRACTOR is operating the Equipment on behalf of CARRIER (i.e., **while under dispatch by CARRIER**). …. [Emphasis added.]

*See Id.*, Appendix E, Page 15 of 15.

At the time of the subject collision, Powell was under dispatch with Coal City as he had already received his next hauling assignment from Coal City. *See* Exhibit 3 to Coal City/XL MSJ - Supplemental Deposition of James Powell at Page 22:3-15. (R. Doc. 36-7).   The XL Policy

insuring Coal City is the very insurance coverage for "**public liability for bodily injury, property damage liability and cargo damage liability**" that Coal City was obligated to provide to Sequoia and Powell under ¶8(a) and Appendix E(1) of the Agreement between Coal City and Sequoia. *See* Exhibit 1 to Coal City/XL MSJ – Agreement (R. Doc. 36-5), at ¶8(a) and ¶8(e), Page 8 of 15, and Appendix E(1), Page 15 of 15. Therefore, the XL Policy provides coverage for the property damage and bodily injuries caused to Colar arising from Powell's negligent operation of the Tractor as he was under dispatch and performing duties in furtherance of the maintenance obligations under the Agreement with Coal City at the time of the subject collision.

Coal City and XL contend at Page 4 of its Memorandum that Powell's trip to O'Reilly's Auto Parts was a "purely personal endeavor, beneficial only to the interests of Sequoia." Notwithstanding the benefit to Sequoia, Powell replaced the windshield wipers and fluid "necessary or required for the safe and efficient operation and maintenance of the [tractor]," in compliance of the Agreement with Coal City. The fact that Powell purchased windshield wipers and fluid for the Tractor for the benefit of Sequoia and Coal City does not render the trip to O'Reilly's Auto Parts to be a "purely personal mission" as Coal City and XL contend in their Motion. Moreover, Powell was staying at the Coal City yard in Gonzales on 06/17/2022 under dispatch orders from Coal City to pick up the Coal City trailer after it was cleaned to haul cargo the next day 06/18/2022 for Coal City from Carville, LA to Garland, TX. When Powell arrived on 06/17/2022 at the Coal City yard in Gonzales before the subject collision, Powell already had his next hauling assignment for Coal City. When Powell drove to O'Reilly's Auto Parts to pick up parts for maintenance on the Tractor, he was under dispatch from Coal City to haul his next load and, under Appendix E, Coal City was required to provide Powell with public liability insurance coverage for the subject collision.

The facts show that Powell's trip to O'Reilly's Auto Parts, when the subject collision occurred involving Colar, was not "a purely personal mission", a "purely personal endeavor," or "a purely personal errand", as Coal City and XL contend in an effort to avoid providing coverage for the damages to Colar arising from the subject collision caused by Powell's negligence; Powell's trip was in furtherance of the business purposes of the Agreement and he was covered by the XL Policy

At Page 2 of their Memorandum, Defendants asserted that Powell was covered by the XL Policy only "if Powell was (1) under dispatch by Coal City **and** (2) pulling a trailer owned by Coal City, the independent contractor agreement required Coal City to maintain insurance coverage for the Sequoia tractor. (Id. at ¶8(d); Appendix "E"). This insurance was provided by XL Insurance." [Emphasis added.] Defendants also claim at Page 7 of their Memorandum that: "once the Coal City trailer is disconnected, the policy excludes coverage for the Sequoia tractor, expressly so when it is being operated by the owner from whom it was borrowed. (*See Id.* at (II)(A)(1)(b)(l ))." However, Defendants' interpretation when coverage applies is inconsistent with the clear words of the Agreement.

The fact that the Coal City trailer was not attached to the Tractor driven by Powell at the time of the subject collision is not dispositive of whether the policy of insurance issued by XL provided coverage to Powell. Appendix E of the Agreement provides that Coal City **shall** provide public liability insurance to Sequoia and Powell while Powell was under dispatch. *See* Exhibit 1 to Coal City/XL MSJ – Agreement (R. Doc. 36-5), Page 15 of 15. Powell was under dispatch with Coal City at the time of the subject collision in Gonzales. *See* Exhibit 3 to Coal City/XL MSJ - Supplemental Deposition of James Powell at Page 22:3-15. (R. Doc. 36-7).

Appendix E does not state that coverage is provided only: 1. when Powell is under dispatch; **and** 2. pulling a trailer owned by Coal City. The XL Policy provides coverage to Powell as long as he was operating the Tractor ("Equipment") under dispatch, even if he was not pulling a trailer owned by Coal City. As Powell was operating the Tractor under dispatch at the time of the subject collision, Coal City was required to provide public liability insurance coverage to Powell for the damages cause to Colar by the subject collision.

La. C.C. art. 1983 provides "[a] contract has the effect of law for the parties and may be dissolved only through the consent of the parties or on grounds provided by law." Thus, the Agreement is the law between the Coal City and Sequoia. Under the Agreement, Coal City was obligated to provide public liability insurance for bodily injury and for property damage liability to cover the damages caused to Colar by Powell's negligence. Under the well-settled rule, "[a] contract is the law between the parties, and courts are obliged to give them legal effect according to the common intent of the parties." 1100 S. Jefferson Davis Parkway, LLC v. Williams, 14-1326, pp. 3-4 (La. App. 4 Cir. 5/20/15), 165 So.3d 1211, 1215-16, writ denied, 15-1449 (La. 10/9/15), 178 So.3d 1005, citing La. C.C. arts. 1983 and 2045. At the time of subject collision, Powell was operating the Tractor on behalf of Coal City under dispatch. Under the clear language of Appendix E of the Agreement, Powell is covered by the public liability insurance provided by the XL Policy. Defendants' interpretation of the Agreement is strained and leads to absurd results and should be rejected.

**C.      Under Louisiana and Federal law, Coal City is vicariously liable for the negligent acts of Powell, its statutory employee.**

At Page 6 of its Memorandum, Defendants argue that "vicarious liability cannot attached (sic) to Coal City as a matter of law and summary dismissal is appropriate" because Sequoia had the "freedom to choose the methods and means of how it will perform ... the transportation services

offered to it" by Coal City.  This characterization incorrectly describes the relationship between Coal City, the motor carrier, and Sequoia, the nominal independent contractor.

First, Coal City has "exclusive possession, control, and use" of the Sequoia Tractor pursuant to ¶3(b) "Carrier's Responsibilities" in the Agreement, which provides:

> CARRIER shall have the following duties and responsibilities:
>
> …
>
> (b) Exclusive Possession and Responsibility. **The Equipment shall be for CARRIER's exclusive possession, control, and use for the duration of this Agreement. CARRIER shall assume complete responsibility for the operation of the Equipment, as required by the Motor Carrier Laws.** This subparagraph is set forth solely to conform with Motor Carrier Laws on regulations and shall not be used for any other purposes, including any attempt to classify INDEPENDENT CONTRACTOR as an employee of CARRIER; nor does this provision alter the INDEPENDENT CONTRACTOR's freedom to choose the methods and means of how it will perform the perform the transportation Services offered to it by CARRIER. Nothing in the provisions required by 49 C.F.R. § 376.12(c)(l) is intended as evidence that INDEPENDENT CONTRACTOR or any worker provided by INDEPENDENT CONTRACTOR is an employee of CARRIER. During the term of this Agreement, **CARRIER will have the exclusive right to subcontract the Equipment to other authorized motor carriers.** …

*See* Exhibit 1 to Coal City/XL MSJ - Agreement, at ¶3(b)(R. Doc. 36-5), Page 4 of 15.  Despite the purported freedom of Sequoia to choose the methods and means of how to perform its duties under the Agreement, Powell testified about the how the exclusive nature of the Coal City Agreement actually worked, as follows:

> Q.    I'm asking you. Does -- let me ask it this way. Does Coal City have exclusive possession and control and use of the -- how the 2015 Peterbilt is used; is that correct?
>
> A.    Yes.
>
> Q.    And since this contract was in effect at the end of 2019, has Sequoia hauled any cargo for any other company other than Coal City?
>
> A.    No.
>
> Q.    And are you the only designated driver by Sequoia to drive that 2015 Peterbilt?

A.   Yes.

Q.   And does Coal City instruct you where to pick up and deliver cargo?

A.   Yes.

*See* Exhibit 2 to Coal City/XL MSJ – Deposition transcript of Powell at Pages 13:14-14:3.  Powell

worked exclusively for Coal City and Coal City told Powell where to pick up and deliver its cargo.

Second, under federal law, Powell is a statutory employee of Coal City.  In Zeringue v.

O'Brien Transport, Inc., 931 So.2d 377 (La. App 5 Cir. 2006), the Louisiana Fifth Circuit Court of

Appeal discussed the regulations and policies that apply to authorized carriers, like Coal City, and

their relationship with owner-operators, like Sequoia-Powell, as follows:

> It is also undisputed that leases between regulated carriers and owner-operators are
> subject to federal law. Turner v. Miller Transporters, Inc., 02-2278 (La.App. 1 Cir.
> 6/27/03), 852 So.2d 478, amended, 02-2278 (La. 1 Cir. 2/23/04), 876 So.2d 848,
> writ denied, 04-762 (La.5/21/04), 874 So.2d 174, writ denied, 04-804 (La.5/21/04),
> 874 So.2d 177.

> Because the common practice of leasing equipment by a carrier operating in
> interstate commerce often led to abuses that presented a threat to the public and the
> trucking industry, Congress amended the Interstate Commerce Act, giving the ICC
> the power to regulate non-owned equipment by interstate carriers. 49 U.S.C.A. §
> 304(e)(1956). As explained in White v. Excalibur Insurance Co., (5th Cir.1979),
> 599 F.2d 50, certiorari denied, 444 U.S. 965, 100 S.Ct. 452, 62 L.Ed.2d 377 (1979).

>> Motor carriers had attempted to immunize themselves from the negligence
>> of the drivers who operated their vehicles by making them all nominally
>> "independent contractors." See generally Transamerican Freight Lines, Inc.
>> v. Brada Miller Freight Systems, Inc., 1975, 423 U.S. 28, 96 S.Ct. 229, 46
>> L.Ed.2d 169; American Trucking Associations, Inc. v. United States, 1953,
>> 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337; Alford v. Major, 7 Cir.1972, 470
>> F.2d 132. In order to be certain that the public would be protected from the
>> torts of these frequently insolvent operators, Congress in 1956 adopted
>> amendments to the Interstate Motor Common Carrier Act requiring a motor
>> carrier to assume "full direction and control" of leased vehicles. **Because
>> the carrier now has both a legal right and duty to control vehicles
>> operated for its benefit, the employees of the vehicle-lessor are deemed
>> statutory employees of the lessee-carrier to the extent necessary to
>> insure the carrier's responsibility for the public safety just as if the**

**lessee-carrier were the owner of the vehicles**. Simmons v. King, 5
Cir.1973, 478 F.2d 857, 867. (Some citations and footnotes omitted)

Id. 599 F.2d at 52-53

49 C.F.R. § 376.12, which is applicable to the lease in question, provides in
pertinent part:

> (c) Exclusive possession and responsibilities.
>
>> (1) The lease shall provide that the authorized carrier lessee shall
>> have exclusive possession, control, and use of the equipment for the
>> duration of the lease. The lease shall further provide that the
>> authorized carrier lessee shall assume complete responsibility for
>> the operation of the equipment for the duration of the lease.
>>
>> (2) Provision may be made in the lease for considering the
>> authorized carrier lessee as the owner of the equipment for the
>> purpose of subleasing it under these regulations to other authorized
>> carriers during the lease.

**The policy underlying the applicable federal law was to impose on lessee-
carriers responsibility for the operation of leased vehicles**. The lease between
Rouselle and Quality reflects that policy. ….

**Because of the grant of the legal right and duty over leased vehicles to the
carrier, the employees of the lessor/vehicle owners are deemed statutory
employees of the lessee/carrier under federal law.** White v. Excalibur Insurance
Company, 599 F.2d 50, 52, and cases cited therein. As explained in White, 599
F.2d at 53;

> The statutory employee status created by federal law may affect employer-
> employees relationships under otherwise controlling state statutes where
> direction and control of the worker by the federally regulated employer are
> central to the regulatory program.

Thus, under the general rule of federal law, Rouselle is a statutory employee of
Quality.

**As explained in White, "Congress wished to impose on lessee-carriers
responsibility for the operation of leased vehicles `as if they were the owners
of such vehicles.'"** Id., 599 F.2d at 54.

Zeringue, 931 So.2d at 379-382 [Emphasis added].  The same factual situation of Zeringue is

present here.  Although Sequoia is nominally designated as an independent contractor in the

Agreement, Powell is a statutory employee of Coal City under federal law and Coal City is responsible for the negligent operation of the Tractor operated by Powell. At the time of the subject collision involving Colar, Powell was under dispatch with Coal City to complete his next cargo hauling assignment and was performing maintenance duties required under the Agreement with Coal City. Therefore, Coal City is responsible for the negligence of Powell which caused the subject collision and damages to Colar.

¶3(b) of the Agreement [*See* Exhibit 1 to Coal City/XL MSJ - Agreement, at ¶3(b)(R. Doc. 36-5), Page 4 of 15] meets the requirements of 49 C.F.R. § 376.12(c)(1) and (2) "Exclusive possession and responsibilities", which provide:

    (1) The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease.

    (2) Provision may be made in the lease for considering the authorized carrier lessee as the owner of the equipment for the purpose of subleasing it under these regulations to other authorized carriers during the lease.

Although 49 C.F.R. § 376.12(c)(4) provides that "An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. 14102 and attendant administrative requirements", Defendants have not provided any proof that they have complied with 49 U.S.C. 14102 to establish an independent contractor relationship with Sequoia. Therefore, Powell is the statutory employee of Coal City absent such a showing by Defendants.

Just like the carrier at issue in <u>Zeringue</u>, Coal City retained exclusive possession and responsibilities over the operation of the Tractor for the duration of the Agreement and Sequoia was a nominal independent contractor. The Court in <u>Zeringue</u>, noted that the policy underlying the applicable federal law under 49 C.F.R. § 376.12 was "to impose on lessee-carriers responsibility for the operation of leased vehicles." <u>Zeringue</u>, 931 So.2d at 380. As in <u>Zeringue</u>,

Coal City, as an authorized carrier, "has both a legal right and duty to control vehicles operated

for its benefit" and Powell, as the driver of the Tractor leased to Coal City, is deemed to be the

statutory employee of the Coal City "necessary to insure the carrier's responsibility for the public

safety just as if the lessee-carrier were the owner of the vehicles." <u>Id</u>.  Under <u>Zeringue</u>, Powell is

the "statutory employee" of Coal City and Coal City is vicariously liable for the negligent acts of

Powell that caused the subject collision.

The Eastern District of Louisiana discussed vicarious liability of a motor carrier, like Coal

City, in <u>Mendoza v. Hicks</u>, No. CV 15-1455, 2016 WL 915297 (E.D. La. Mar. 10, 2016), and held

"a lessee is vicariously liable for the driver of its leased vehicle regardless of whether the driver

qualifies as an employee or independent contractor under state law" (<u>Mendoza v. Hicks</u>, page 8)

based on the following reasoning:

> Read together, these regulations [the Federal Motor Carrier Safety Regulations, 49
> C.F.R. § 350 et seq.] impose statutory liability on the lessee of a vehicle "if the
> lessee permits a non-employee to operate the leased equipment and that operator
> causes damages." <u>Tolliver v. Naor</u>, 2001 WL 755403, at *1 (E.D. La. July 3,
> 2001)(citing <u>Jackson v. O'Shields</u>, 101 F.3d 1083, 1086 (5th Cir. 1996). As the Fifth
> Circuit explains, a driver becomes a "statutory employee" when a lease exists
> between an authorized carrier and an owner of leased equipment. See <u>Jackson</u>, 101
> F.3d at 1086. "Consequently, the carrier will be held vicariously liable for injuries
> resulting from the use of the leased equipment." <u>Id</u>.

<u>Id.</u>, page 6.    The Court held further:

> The [Federal Motor Carrier Safety] Regulations do not transform an independent
> driver into the carrier's employee under state law. Rather, a lessee is vicariously
> liable for the driver of its leased vehicle regardless of whether the driver qualifies
> as an employee or independent contractor under state law. This interpretation is
> consistent with the underlying policy goals of the Regulations: to prevent carriers
> from avoiding liability for damage caused by negligent operation of their leased
> vehicles.

<u>Id</u>, page 8.

As in <u>Mendoza</u>, Powell was the driver of the Tractor leased to Coal City under an exclusive Agreement at the time of the subject collision. Under <u>Zeringue</u> and <u>Mendoza</u>, Powell is the "statutory employee" of Coal City, whether he is an employee or an independent contractor under Louisiana law. Therefore, Coal City is vicariously liable for the negligent acts of Powell that caused the subject collision and the resulting damages to Colar under federal law.

To allow Coal City to refuse to provide coverage under the XL Policy for the negligent acts of Powell while operating the Tractor for Coal City under the Agreement would frustrate the very purpose of the Federal Motor Carrier Safety Regulations to prevent motor carriers from avoiding liability for damage caused by negligent operation of their leased vehicles. Therefore, the XL Policy issued to Coal City provides coverage for the negligent acts of Powell and covers the damages to Colar arising from the subject collision. Accordingly, Coal City and XL are not entitled to be dismissed by summary judgment.

## IV. THE MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANTS, COAL CITY AND XL, SHOULD BE DENIED

Plaintiff Colar has established there is a genuine issue of whether or not the XL liability policy issued to Coal City provides liability insurance coverage for the damages of Colar caused by the subject collision involving Powell. The evidence of Colar, as the nonmoving party, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." Defendants have not carried their burden to show there is no genuine dispute of material fact and that they have not shown they are entitled to judgment as a matter of law. For the reasons set forth herein, the Motion for Summary Judgment (R. Doc. 36) filed by Defendants, Coal City COB

Company, Inc., and its insurer, XL Insurance America, Inc., should be DENIED.


Respectfully submitted,

Stephen M. Alexander (LSBA #29066)
**ALEXANDER LAW GROUP, LLC**
8550 United Plaza Boulevard, Suite 702
Baton Rouge, LA 70809
P.O. Box 41860
Baton Rouge, LA 70835
225-922-4488 (Office)
888-670-7025 (Fax)
225-229-4512 (Mobile)
E-mail: stephen@alexander.com

**AND**

*/s/ Charles S. Lambert, Jr.*
Charles S. Lambert, Jr. (LSBA# 21685)
**LAW OFFICES OF CHARLES S. LAMBERT, JR., LLC**
10537 Kentshire Court, Suite A
Baton Rouge, Louisiana 70810
Phone:  (225) 769-1414
Fax: (225) 769-2300
Mobile : (225) 405-0660
E-mail: Lambert.Chip@Outlook.com

**ATTORNEYS FOR PLAINTIFF, MICHAEL ANTHONY COLAR, JR.**


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been electronically filed on

**May 21, 2025**, with the Clerk of Court using the CM/ECF system.  Notice of this filing will

be forwarded to all counsel of record via the Court's Electronic Filing System, email,

facsimile, and/or by U.S. Mail.

*/s/ Charles S. Lambert, Jr.*
Charles S. Lambert, Jr.